UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA,            ) | |
| ) | |
| Plaintiff,            ) | No. 7:20-CR-23-REW |
| ) | |
| v.            ) | |
| ) | PRELIMINARY FORFEITURE ORDER |
| ) | |
| EUGENE SISCO III,            ) | |
| ) | |
| Defendant.            ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Based on the §1343 and § 1347 convictions, *see* DE 1 (Indictment) and DE 87 (Jury Verdict), and pursuant to the linked § 981[1] and § 982[2] forfeiture provisions, the Government now seeks a preliminary order of forfeiture as to $3,200,000.00 in crime proceeds received by Sisco. *See* DE 101 (Gov. Motion for Forfeiture). The matter is briefed. DE 105; DE 108.

Rule 32.2 sets the mechanics:

> A court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or information contains notice to the defendant that the Government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute.
> . . . .

---

[1] The statute, in relevant part, provides for forfeiture as to individuals convicted of certain felonies, including § 1343; it provides that "any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity (as defined in 1956(c)(7))'" is subject to forfeiture to the United States. 18 U.S.C. § 981(a)(1)(C). *See also* 18 § U.S.C. 1956(c)(7) ("[T]he term 'specified unlawful activity' means . . . any activity constituting an offense listed in section 1961(1) of this title"); 18 U.S.C. § 1961(1) (listing section 1343 wire fraud). Section 2461(c) of Title 28 mandates forfeiture for an underlying conviction.

[2] This statute provides that "the court, in imposing a sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." 18 U.S.C. § 982(a)(7). *See also* 18 U.S.C. § 24(a)(1) ("As used in this title, the term 'Federal health care offense' means a violation of . . . section 1347").

1

> As soon as practical after a verdict or finding of guilty . . . on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.
>
> . . . .
>
> The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence of information submitted by the parties and accepted by the court as relevant and reliable. If the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty.

FED. R. CRIM. P. 32.2(a), (b)(1)(A). As to notice, the Indictment's forfeiture allegation, which cited the proper statutes, fully satisfied the 32.2(a) requirement. DE 1 (Indictment) at 11 ("**MONEY JUDGMENT**: A sum representing the gross proceeds in aggregate obtained by the defendant as a result of the violations alleged in the Indictment."). Neither party requests a hearing. Thus, the Court, having tried the case, deferring to the jury's verdict, and seeing no relevance or reliability concerns in Sisco's response, DE 108, will resolve forfeiture and Defendant's request for stay of forfeiture on the paper record. *See* FED. R. CRIM. P. 32.2(b)(1)(B).

The Court must decide whether, on the full record, the Government has preponderantly proven that the $3,200,000 to be forfeited has a "sufficient nexus or substantial connection to [either] underlying offense." *United States v. Evers*, 669 F.3d 645, 660 (6th Cir. 2012) (citations and quotation marks omitted); *see United States v. Jones*, 502 F.3d 388, 391 (6th Cir. 2007) (Government faces a preponderance burden). The query evaluates the proceeds scope under the statutory provisions cited, which tie to the underlying crimes of conviction. Section 853 of Title 21 governs mechanics, via both sections 2461 and 982. A money judgment is proper as a forfeiture mechanism. *See United States v. Hampton*, 732 F.3d 687, 690-92 (6th Cir. 2013).

Because the Government pursues a forfeiture money judgment, rather than targeting specific tainted property, the analysis has two stages. The first is akin to the forfeiture inquiry for identified property. That is, the Government must show that the amounts sought are, under the applicable statutes, forfeitable proceeds. Next, and because any defense-assets the Government pursues "to satisfy such [ ] money judgment[s] will necessarily be substitute assets, the Government must comply with the requirements of [§] 853(p)(1)." *United States v. Abdelsalam*, 311 F. App'x 832, 847 (6th Cir. 2009). That is, the Government must show that Defendant's "property subject to forfeiture [at step 1] as proceeds or instrumentalities has been transferred, placed out of reach of the court or [ ] declined in value." *United States v. Hooper*, 229 F.3d 818, 823 (9th Cir. 2000). The Court addresses each inquiry in turn.

First, a word about the verdict and crimes. The jury found that Sisco committed wire and health care fraud, as charged in the Indictment. *See* DE 87 (Verdict). The wire fraud centered on fraud against addiction treatment clinic Medicaid patients from 2016-19, where Sisco's clinics improperly charged a cash amount for covered Medicaid services and lied to patients and others to perpetuate the scheme. *See, e.g.*, DE 1 (Indictment). The health care fraud focused on urine drug testing ("UDT") billing—essentially, from 2016-20, the clinics charged for expensive and duplicative urine screens with no physician order, direction, or established medical necessity. The blanket orders setting up the protocols came from non-physician Sisco. The jury heard that Sisco alone governed clinic management and operations, particularly the scheme and approach on the cash component for Medicaid and all mechanics for the UDT program. The jury convicted on both counts. *See* DE 87.

Trial exhibits for the period of the crimes, created by FBI Forensic Accountant Jennifer Ratterman, as supported by her testimony, showed total cash deposits into two bank accounts

controlled by Eugene Sisco III (alone for one entity, jointly for the other) and, in part, Alexandria Allen (the defendant's sister) totaling $5,078,495.99 during the relevant period. *See* Gov. Exs. 11A-3 (chart showing total cash deposits in two accounts); 11A-1 (chart showing that Eugene Sisco III was sole signatory on account x1761 and joint signatory on account x3990). Ms. Ratterman also analyzed deposit receipts generated by a safe used by the Sisco clinics to keep cash collected from patients and compared these deposit receipts to cash deposited into the two bank accounts. *See* Gov. Exs. 4A-4L (cash deposit receipts generated by safe); 3A-3L (paper record of cash collected daily from each patient). Ratterman testified that the safe receipts and bank deposit amounts nearly always matched exactly. Analysis from those same two bank accounts also showed $2,212,764.10 flowing out of the accounts and directly to Defendant Sisco. *See* Gov. Exs. 11A-9 (showing $1,224,038.62 paid to Sisco and characterized as "owner's draw" and "rent"); 11A-11 (showing $487,934.75 in wages paid to Sisco during relevant period); 11A-6 (showing $132,203.93 paid directly to Sisco out of account x3990); 11A-5 (showing $99,771.80 paid directly to Sisco out of account x1761). Ratterman testified to an additional $248,815 paid to Sisco as "owner's distribution" from Toxperts, LLC, which was Sisco's laboratory used to conduct UDT. The cash amount is directly significant because cash came largely from Medicaid patients; clinic employees (e.g., Megan Johnson) estimated that 75% of the patient roster was Medicaid enrolled. This would put about $3.8 million as the fraud-based total, on known records.

      Trial exhibits created by Jason Vertrees, a USAO auditor, supported by his testimony, showed that from 2016 through 2020, the Medicaid and Medicare programs reimbursed over $4.6 million to Toxperts, LLC for UDT. *See* Gov. Ex 7A-1 (chart showing total billed for UDT at Toxperts at $4.6 million). Vertrees's testimony further established that Toxperts received 99% of its business from clinics owned by Sisco, showing that Sisco's health care fraud scheme of

4

unnecessary UDT at his clinics was the core source of funds generated by Toxperts. *See* Gov. Exs. 7A-4 (showing that Toxperts received over 99% of its business from Sisco clinics); 7A-2 (showing number of unique patient visits billed to Medicaid). Sisco ran the show at Toxperts, and the proof showed a scheme of picking high-cost, duplicative tests and test frequency designed to maximize revenues. Again, non-physician Sisco, alone, set the protocols, frequency, options, and testing mechanics.

As to these lofty totals, on both the clinic cash and the UDT reimbursements, the Court notes that Sisco showed and had direct control over and management of the entities, including the umbrella management system he himself created.

Finally, and as a reference point for the precise forfeiture request, Sisco's personal accountant, John Williamson, testified in Sisco's case. Williamson testified that he reviewed Schedule K-1 filings indicative of partnership profits of Sisco's businesses flowing to Sisco personally, explaining that for the relevant period Sisco received around $2.8 million in profits from his clinics. Williamson also reviewed wages paid to Sisco during the relevant period, testifying that Sisco received about $400,000 from this source. In total, Williamson established, through review and analysis of Sisco's personal tax returns and business filings, that Sisco directly obtained $3.2 million in pre-tax income from the clinics during the years in question. Unlike the Government, which had incomplete banking and financial records, Williamson had source materials blanketing the full time. Thus, clinic operations poured well over $8 million in tainted funds into Sisco's organizational coffers. From those impugned coffers, Sisco personally took $3.2 million in income or profits over the period. The conservative Government-sought figure is well substantiated.

Sisco resists forfeiture on two grounds. First, he asserts, as a recurring post-trial trope, that

the Court denied him a jury determination on forfeiture. Given that post-trial counsel is new, the Court views the argument charitably, but has two dispositive responses.

First, pre-trial, the Court raised the issue with the parties. Perceiving that the Indictment sought only a money judgment, the Court queried the parties on whether the matter would be submitted to the jury. The prosecutor and defense counsel affirmatively agreed that the jury would not be involved in the forfeiture phase. Rule 32.2(b)(5)(A) clearly states, "the court must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of *specific property* if it returns a guilty verdict." Fed. R. Crim. P. 32.2(b)(5)(A) (emphasis added). The rule assigns determination of "the amount of money that the defendant will be ordered to pay" to the Court. *Id.* at (b)(1)(A). Sisco not only did not request jury involvement—he, by counsel, affirmatively agreed that the jury would have no role. That is what occurred and is fully compliant with the rule's rubric. Incidentally, the defense cites no trial request by Sisco that the jury address the money judgment issue.

Second, Sisco has no constitutional, statutory, or rule-based right to have a jury determination of a forfeiture money judgment. *See, e.g.*, *United States v. Ponzo*, 853 F.3d 558, 589 (1st Cir. 2017) (joining several other circuits in holding that "the criminal rules 'do not require a jury determination in the form of a personal money judgment.'"); *United States v. Curbelo*, 726 F.3d 1260, 1277 (11th Cir. 2013) ("By negative implication, a party is *not* entitled to a jury finding regarding a money judgment. Instead, 'the *court* must determine the amount of money that the defendant will be ordered to pay.'") (citing Fed. R. Crim. P. 32.2(b)(1)(A)) (emphasis in original); *United States v. Phillips*, 704 F.3d 754, 771 (9th Cir. 2012) (same). Sisco musters no cases validating a jury right in this context.

Sisco next raises a *Honeycutt* argument, asserting that the motion for forfeiture "seeks to

6

hold him jointly and severally liable for proceeds that were not obtained by him personally." DE 108, at 4; *see Honeycutt v. United States*, 137 S. Ct. 1626, 1635 (2017) ("Forfeiture pursuant to § 853(a)(1) is limited to property the defendant himself actually acquired as the result of the crime."). Sisco asserts that because his sister Alexandria Allen was a co-owner in (part of) the business, it is impossible to determine whether the forfeiture amount reflects only those proceeds directly or indirectly obtained by Sisco himself.

Sisco's attempts to muddy the waters now are unpersuasive. First, only the ASAP companies were jointly owned by Ms. Allen, per her testimony and the testimony of several of Sisco's employees. The Renew family of companies, including the profitable Toxperts, LLC, lab, was solely owned by Eugene Sisco III. Second, and as discussed, witnesses Ratterman, Vertrees, and Williamson testified to and traced operational money personally received by Sisco, in bank accounts he controlled, checks written only to him, wages paid directly to him, and on his personal income tax returns. Sisco's personal income tax returns and Schedule K-1 partnership income reports, in particular, form the basis for the Government's motion for forfeiture. *See* DE 101, at 5-6. As the Government stated in reply, it "is not predicating its motion for a money judgment on the gross cash proceeds received by ASAP" during the relevant period. DE 110, at 2. There is simply no basis for Sisco to now argue that any of the target funds, substantiated as flowing only to him personally, could be reasonably attributable to Allen, and thus not directly or indirectly obtained by him. There is no *Honeycutt* issue here, and the Government proved at trial that Sisco personally obtained at least $3.2 million from his schemes.[3]

---

[3] This is undoubtedly conservative, given Sisco's thorough control of the entities and the umbrella management structure he created. The clinics and lab were all within an integrated operation that Sisco ran. In a very real sense, he controlled every dollar that entered. That said, the route of seeking to forfeit only the funds that Sisco ultimately accessed and received as personal remuneration or profit is undoubtedly solid, cautious, and properly grounded.

As to the Section 853(p) concern, the Government covers adequately the bases in its motion, asserting that "[t]he evidence establishes that, as a result of the acts or omission of the Defendant, the forfeitable proceeds received by the Defendant cannot be located upon the exercise of due diligence; have been transferred or sold to, or deposited with, a third party; have been placed beyond the jurisdiction of the court; have been substantially diminished in value; or have been commingled with other property which cannot be divided without difficulty." DE 101, at 6; *see* 21 U.S.C. § 853(p)(1). Given that all tracing follows the path of money Sisco took from and deposited into distinct accounts, the 853 third-party transfer and/or commingling elements surely apply. Sisco deposited the funds into personal accounts; he also (as touted at trial) paid taxes with some of the funds. These acts, which all implicate a level of transfer and/or commingling, trigger the 853(p) characterization. *See, e.g.*, *United States v. Gallion*, No. 2:07-39-DCR, 2009 WL 2242413, at *3 (E.D. Ky. July 24, 2009) (explaining that "any other property" language in 853(p)(2) "has been interpreted as meaning that Congress did not intend to limit the type of property" that may be subject to forfeiture); *United States v. Javaherpour*, 78 F. App'x 452, 457 (6th Cir. 2003) (affirming forfeiture of money deposited into bank account when proceeds of illegal activity had been transferred). Sisco does not contest this or any of the underlying financial totals. His efforts to thwart forfeiture rely on process arguments (the jury question) and *Honeycutt*. The Court rejects both and orders forfeiture at the sought total.

Finally, Sisco, citing Rule 32.2(d) without further explanation or justification, asks for a stay of forfeiture pending resolution of his appeals. DE 108, at 5. Rule 32.2.(d) provides that "[i]f a defendant appeals from a conviction or an order of forfeiture, the court *may* stay the order of forfeiture on terms appropriate to ensure that the property remains available pending appellate review." FED. R. CRIM. P. 32.2(d) (emphasis added). The Rule does not indicate what factors

should inform the decision, but other courts often look to (1) the likelihood of success on appeal; (2) whether the forfeited asset is likely to depreciate over time; (3) the forfeited asset's intrinsic value to the defendant; and (4) the expense of maintaining the forfeited property. *See, e.g.*, *United States v. Droganes*, 893 F.Supp.2d 855, 894 (E.D. Ky. 2012). The Defendant provided no argument on any of these points. Besides being procedurally premature, the Court does not see anything on this record indicating the need for a stay. The Government seeks only a forfeiture money judgment, not forfeiture of any specific property. Sisco's convictions are well supported by the evidence presented at trial. If Sisco is successful on appeal, there is no reason to doubt availability post-appeal of any money collected. *See United States v. Gallion*, 2009 WL 1702166, at *8 (E.D. Ky. June 17, 2009). The Court thus denies Sisco's request to stay forfeiture as both procedurally invalid and substantively unsupported.

The Court finds that the Government has preponderantly proven forfeitability as to $3,200,000.00. The amount conservatively reflects Sisco's proceeds traceable to the crimes of conviction. Accordingly, and under Fed. R. Crim. P. 32.2(b)(2), the Court **GRANTS** DE 101 and preliminarily **ORDERS** as follows:

1. Pursuant to 18 U.S.C. §§ 981, 982 and 853, the Court **ENTERS** a forfeiture money judgment against Defendant Eugene Sisco III in the amount of $3,200,000;

2. The Court retains jurisdiction in this matter for the purpose of, as necessary, enforcing or amending this Order, *see* Rule 32.2(e);

3. The United States, though the Attorney General (or a designee) may take steps consistent with 21 U.S.C. section 853 and Rule 32.2(b)(3) to collect the judgment;

4. The United States may seek to amend the Order to include particular substitute property under Rule 32.2(e);

5. The United States **SHALL**, upon seizure of any property for purposes of satisfying this judgment, provide notice to persons who may have an interest in such property per section 853 (and the United States may conduct appropriate discovery and any necessary ancillary proceedings, pertinent to collection of the judgment, consistent with the statutes and rules);

6. The Order will become final, under Rule 32.2, at, per, and as part of final sentencing; and

7. The Clerk shall serve this Order on the United States Marshals Service and the United States Probation Office.

This the 20th day of December, 2021.

Signed By:
Robert E. Wier
United States District Judge