UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs.                                            ) | **Criminal Action No.:** |
| ) | **7:20-CR-023-REW-01** |
| ) | |
| **EUGENE SISCO, III**                ) | |

*ELECTRONICALLY FILED*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT

Comes now the Defendant, Eugene Sisco III, by and through Counsel, and hereby files the following objections to the Presentence Report (the "PSR") which was prepared by the United States Probation Office for the Eastern District of Kentucky.

### I. LOSS AMOUNT: Cash Payments

The Presentence Report "PSR" suggests a combined total loss amount in excess of $3,500,000, but not to exceed $9,500,000, including adjustments for specific offense characteristics.  The Defendant was given a total +31 adjusted offense level.  The Defendant objects to such offense level and states that the offense level should not include a, (a) +2 pursuant to 2B1.1(b)(7)(B)(i) for government loss in excess of $1,000,000, (b) +2 pursuant to 3B1.3 for the Defendants role in the offense, and (c) the +18 adjustment for amount of loss between $3,500,000 and $9,500,000 pursuant to 2B1.1(b)(1)(J).  Further the Defendant makes specific objections to the following paragraphs contained within the PSR: paragraphs **45 thru 48, and 56,** collectively, as it relates to the calculation of economic loss and the resulting adjusted offense level of +18; paragraph **58** as it relates to a +2 adjusted level under 2B1.1(b)(7)(B)(i) for loss to the Government healthcare program; paragraph **112** as it relates to the total adjusted offense level being set at +31 with a range of 108 months to 135 months; paragraphs **60** (+2 for

role in the offense) **and 128** (unawareness of any factors, either mitigating or aggravating, which would justify a departure from the guideline range).

The PSR approximates $5,000,000 in gross cash deposits were received by the Defendant, from May 10, 2016, thru October 1, 2019, while only attributing 75% of such amount to economic loss for purposes of sentencing. This figure is based upon the testimony of Megan Johnson, wherein Ms. Johnson stated that the clinic would see as low as 25 patients a day, each paying $200 per month, with approximately only 75% of patients having Medicaid insurance. Ms. Megan Johnson was a secretary at Renew Addiction Treatment and was trained by Tammy Mullins, Office Manager, wherein Ms. Mullins testified that on an average day, cash collected, could yield as low as $4,870. Given the testimony of Ms. Mullins of $4,870 per day, adjusting for only 75% of such, the total economic loss amount would be less approximately $3,000,000. This amount being lower than $3,500,000 and would adjust downward the Defendant's offense level.

However, use of either formula above would necessary omit eight factors or variables that the Defendant believes the Court should consider that significantly alter the total economic loss: **(1)** correct number of patients per day that were seen by the clinic, **(2)** whether each patient actually paid cash **(3)** what amount of cash was paid, **(4)** whether those patients were Medicaid recipients, **(5)** whether the patient was actually entitled to receive Medicaid insurance, **(6)** whether the patient was compliant with payment of counseling services, (evidence in patient charts of non-compliance with counseling services, **(7)** any reimbursement that any patient may have received, and **(8)** the duration and scope of patient attendance in the Sisco MAT program.

Use of these eight factors would require a significant investigation into individual patient charts. However, simply using the average number of patients and average number of cash paid

method, would inherently omit these highly relevant factors.  While the Defendant will set forth arguments that no economic loss occurred, he believes that if the Court does attribute such economic loss then it should only include monetary figures derived from the victim impact statements obtained in this matter.

It is obvious that Probation Office worked very hard on completing such a lengthy PSR, and the Defendant appreciates and commends them for such dedication.  The vague and speculative nature of the financial testimony produced at trial makes it difficult to pinpoint any accurate losses, therefore, due process respectively would prompt the Court to use an alternative formula to address the any amount of loss. Without waiving the Defendant's argument for no economic loss, the Defendant proposes to the Court that the most accurate, and arguably only viable method for calculating economic loss, would be the actual economic tally via the disclosed victim impact questionnaires.  These questionnaires are the closet and truest measure of calculable loss, in that they are direct statements from the purported victims themselves. All other estimated loss calculations adopted by the PSR, are variable, wide-ranging, and speculative.

**LOSS AMOUNT:  Urine Testing**

As it relates to the calculation of loss resulting from urinalysis testing the Defendant should not be held liable for gross reimbursements for drug testing.  The PSR contains several loss amounts for drug testing. One calculation maintains a loss of approximately $5,000,000 from drug testing, another amount is $4,600,000 million, and yet another is $2,000,000.  Further, approximately $2,000,000 of reimbursed drug testing amounts are currently being held in an escrow account that have never been released to the Defendant, and it is unknown whether this "escrowed amount" was accounted for into either calculation mentioned above relating to

Medicaid loss for drug testing.  Again, without waiving any argument for no economic loss for drug testing, the Defendant should be given a credit for such "escrowed amounts".

Importantly, for billing parameters, 907 KAR 3:005 subparagraph 8, states that "Direct physician contact" means that the billing physician is physically present with and evaluates, examines, treats, or diagnoses the recipient".  Because it is uncontested that all patients saw physicians in person and had their charts reviewed by such physicians, then as it relates to patient's billing, testing, evaluations, treatments, and KASPER verifications, these patients/victims did receive actual medical treatment relying upon drug testing.  Therefore, the net economic loss in this aspect is zero.

Further it is undeniable that urine testing must be performed as a result of participation in a MAT program utilizing suboxone.  Among recovery from substance abuse, a collateral goal behind suboxone treatment is to create an individualized treatment plan wherein the patient is eventually "weened" off suboxone.  This weening process involves the physician not only being able to validate the presence of suboxone in the patient's blood, but also to determine the level of suboxone in the patient's blood.  If the patient's level is not consistent with the individualized treatment plan, then the patient is non-compliant.  In order to accurately confirm patient compliance, the utilization of presumptive and definitive drug testing is commonplace in the field, as attested to by the physicians at trial.

While the issue of medical necessity was disputed at trial, the Court has discretion to declare no economic loss for urine testing for sentencing purposed and adjust the Defendant's offense level accordingly by removing the +18 adjustment to his base level offense.

Further evident was the electronic health records of patients in this case which revealed that treating physicians either ordered the patient to receive a drug test, via verbal or written order, or ratified any blanket/standing order for drug testing procedure being completed by Sisco's laboratories. It is the duty of the treating physician to ensure that such drug testing occurred, and that is exactly what the treating physicians in this case did, and noted such in their patients' charts and treatment.

Therefore, no economic loss for either presumptive or definitive drug testing has ever occurred under the applicable terms instituted by the Department of Medicaid. Therefore, the Defendant believes that no economic loss can be held as it relates to loss by the Department of Medicaid for urine testing, and any associated points/additional points to the base level offense should be removed.

**CREDIT AGAINST LOSS - FAIR MARKET VALUE OF SERVICES RENDERED :**

Should the Court find that a loss did occur, either to the purported victims or to the Department of Medicaid, then the Defendant requests the Court consider giving him a fair market value credit against any such loss for services rendered. Under, USSG 2B1.3(b)(1)(E) a credit for loss may be given for the fair market value of any services rendered.

Further, the Federal Sentencing Commission in Amendment 749 added a special rule to Application Note 3(F) which provides that "if a defendant is convicted of a Federal health care offense involving a Government health care program the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, *if not rebutted*."

In United States v. Singh, the Court held that the fraudulent submission of a Medicare/Medicaid bill can be measured as an intended loss, though defendant may have provided some legitimate services, none of the services provided in that case were reimbursable by Medicare/Medicaid. 390 F. 3d 168, 194 (2nd Cir. 2004). However, in the instant case, the Defendant's clinics did provide a legitimate service, such as counseling and drug testing which are reimbursable items by the Department of Medicaid. Along with the evidence presented at trial, which discussed the Defendant's counseling services and use of drug screening, the Defendant intends at sentencing to produce further evidence of legitimate counseling and drug screening services.

Below are cases wherein a Defendant sought a credit against loss for services rendered, while not all favored the Defendant, the analysis of these cases set forth the parameters in which a Court may consider such credit for legitimate services. See, United States v. Karie, 976 F.3d 800, 804 (8th Cir. 2020) (affirming loss calculation where defendant did not present evidence of legitimate daycare services); United States v. Bikundi, 926 F.3d 761, 797–98 (D.C. Cir. 2019) (affirming $80 million loss calculation because defendants "did not produce evidence of [legitimate] services with any specificity").

Further, in United States v. Adebimpe, the Court's ruling noted that "in calculating the amount of the intended loss, the district court was not required to discount the value of any wheelchairs that happened to be medically necessary, because the medical examinations mandated to determine medical necessity were not performed." 649 F. App'x. 449, 452 (9th Cir. 2016)  Contrary to Adebimpe, the Defendant Sisco's laboratories did conduct legitimate drug testing after each physician conducted a medical examination.

While the evidence at trial differed on whether the use of both the presumptive and definitive testing was medically necessary, for purposes of loss calculations and offense level for sentencing, the Court has the authority to hold that all testing was a legitimate service and declare no loss, or at the very least lessen the amount of loss attributable to the Government to more accurately reflect what testing, according to physician witnesses, was medically necessary.

Ambiguously, several physicians at trial opined a dislike for the clinic's drug testing procedures, yet all physicians utilized the results to treat their patients, by either personally ordering the presumptive and/or definitive testing be conducted, or ratified the clinics procedure by later noting in patient charts/health records that screening and billing was appropriate.

Therefore, the Defendant's offense level should be adjusted to account for no loss relating to drug testing.

Regarding the cash payments made by purported victims; taking the total number of victim impact questionnaires at 236 with each victim paying approximately $200 per month for a period 42 months (May 2016 to October 2019) a total amount of loss would be $1,935,200. Because the Defendant's clinics provided a counseling service, and there was no evidence in the record that such counseling services were not adequate nor achieve therapeutic goals, a fair market value of such services can be attributed to the economic loss, resulting in no economic loss, and adjust the Defendants' offense level accordingly.

**<u>Adjustment for Role in the Offense:</u>**  Defendant objects to **paragraphs 60** (+2 for role in the offense) **and 128** (unawareness of any factors, either mitigating or aggravating, which would justify a departure from the guideline range).

The Defendant, while classified as an owner, simply served in an administrative role within the clinic. This diversion and discrepancy in urine testing was certainly outside the Defendant's perception and accountability.  Therefore, the Defendant's reliance upon the doctors in these clinics should not be overshadowed or clouded by the indictment or subsequent conviction.  This insight should merit a departure from the guidelines, and the Defendant should not be considered to have violated a position of public or private trust or that of having a special skill.  In the context of this conviction, the Defendant had no special skills, instead the Defendant relied heavily upon those physicians who did maintain the special skill of practicing medicine.

The undersigned attorneys present this next argument respectfully before the Court.  If the witnesses' testimony at trial be true*, that they diverted their suboxone by selling it on the street for money to pay for counseling services, then how can it also be true that their urine screenings were in a range conformity, if the doctors were not over-prescribing medications?* Therefore, one of two disturbing possibilities must exist, either the testimony of the witnesses who diverted medicine is inherently false or the physicians were in fact over-prescribing medications and failed to notify the Defendant of their errant practices.  The Defendant's purported blanket/standing order may have been a rudimentary attempt to keep the clinics' prescribing doctors honest, instead of having them run afoul of proper medical standards.  The very nature of these two disturbing possibilities should preclude the imposition of a harsh or severe sentence, because it would not serve the interests of justice.  The likelihood that either, or both, possibilities are true should also be of grave concern to the Court.

Thus, the +2 level enhancement or adjustment suggested by the PSR is not applicable. The goal of these clinics is to assist patients with recovery from substance abuse and eventual weening off suboxone, therefore the Defendant's conduct clearly served a mitigating role.  There

is no other punitive label that can be realistically applied against the Defendant in light of these facts.

The Defendant respectfully believes that the final adjusted offense level should be 9 rather than 31, under the guidelines, by removing; (a) +2 pursuant to 2B1.1(b)(7)(B)(i) for government loss in excess of $1,000,000, (b) +2 pursuant to 3B1.3 for the Defendants role in the offense, and (c) the +18 adjustment for amount of loss between $3,500,000 and $9,500,000 pursuant to 2B1.1(b)(1)(J).

The Defendant reserves the right to soon file a subsequent Motion for variance/downward departure along with a Pre-sentencing Memorandum pursuant to paragraph 129, covering the factors set out in 3553(a) and all other relevant matters.

Respectfully submitted,

/s/Jonah L. Stevens
Jonah L. Stevens
P.O. Box 1286
Pikeville, Kentucky 41501
(606) 437-6555; and

/s/ Justin C. Hamilton
Justin C. Hamilton
P.O. Box 1286
Pikeville, Kentucky 41501
(606) 213-5299 or
(606) 424-6314
justinhamiltonlaw@gmail.com

Counsel for Defendant

**CERTIFICATE OF SERVICE**

This is to certify that a true and accurate copy of the foregoing Defendant's Objections to the Pre-sentence Report was filed electronically with the Clerk of the Court this 15th day of February 2022. Notice of this filing will be sent electronically to all counsel of record through

PACER, the Court's electronic filing system. In addition, a copy of this document will be sent via email or regular mail, postage prepaid, to Melissa Reynolds, U.S. Probation Officer, U.S. Federal Courthouse, 310 South Main Street, Rm 248, London, KY 40741

/s/ Jonah L. Stevens, and

/s/ Justin C. Hamilton