UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 7:20-CR-23-REW |
| | ) | |
| v. | ) | |
| | ) | OPINION & ORDER |
| | ) | |
| EUGENE SISCO III, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Defendant Eugene Sisco III moves for a new trial under Rule 33, *see* DE 99, or in the alternative, a judgment of acquittal under Rule 29, *see* DE 100. The United States responded to each, DE 123, and Sisco replied, DE 125. The Court proceeds to the merits of each motion on a full record.

The Government offered significant proof (nearly thirty witnesses and dozens of documentary exhibits) that well-supported the guilty verdicts on Counts 1 & 2. The jury heard the proof, including Sisco's own case, and found beyond a reasonable doubt that Sisco had engaged in both wire and health care fraud regarding his Suboxone clinic operations. The verdict is unassailable under Rule 29 and Rule 33. The arguments for relief fail. The Court **DENIES** both DE 99 and DE 100.

## I.    Background

The United States charged Sisco with one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of health care fraud, in violation of 18 U.S.C. § 1347. DE 1 (Indictment). The case proceeded to trial over six days in November of 2021; the jury returned a guilty verdict on both counts. *See* DE 85 (Mins. for trial day 6); DE 87 Verdict. The pending post-trial motions followed. The full transcript is in the record. DE 112-118.

## II.     Rule 29 Motion

### a.   Legal Standard

A defendant seeking acquittal under Rule 29 based on evidence insufficiency "bears a very heavy burden." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006). Under Rule 29, courts may supplant a jury conviction only if a defendant shows that no reasonable jury could have found that the prosecution proved the essential charge elements beyond a reasonable doubt. *See Jackson v. Virginia*, 99 S. Ct. 2781, 2789 (1979). In conducting this analysis, a court does not weigh the evidence anew but views all proof through a prosecution-favorable lens. *United States v. Kennedy*, 714 F.3d 951, 957 (6th Cir. 2013) (citation omitted). The assessing court must draw reasonable inferences in the government's favor, eschew credibility evaluations, and avoid swapping its judgment for that of the jury. *See United States v. Ward*, 957 F.3d 691, 695-96 (6th Cir. 2020). If substantial and competent evidence supports the result, the verdict stands. *See id.*

### b.   Discussion

In his Rule 29 motion for judgment of acquittal, Sisco raises six errors or theories of insufficiency at trial, namely, that the government failed to show: (1) "any evidence that the Defendant's conduct of requiring patients to pay cash for certain services was illegal conduct"; (2) "sufficient evidence that the urine testing was not a medically prudent or sound therapeutic service"; (3) evidence that Sisco ever billed clinic patients and Medicaid or Medicare for the same service, i.e., double billing; (4) enough evidence to overcome Sisco's defenses of mistake of law and good faith; (5) evidence of fraud, deceit, or misrepresentation by Sisco; and (6) that Sisco's Statements of Financial Responsibility contained fraudulent or misleading facts. *See* DE 100 at 2-3.

Eugene Sisco owned several addiction treatment clinics in Kentucky providing medication-assisted treatment ("MAT") for opioid addiction, a treatment protocol that included three recognized legs: Suboxone prescriptions, urine drug testing ("UDT"), and counseling services. Sisco's

companies were organized with ADAPT as the parent (management) company and Renew Addiction Treatment Clinic ("Renew" or "BHP"), and Toxperts, LLC ("Toxperts") as ADAPT's subsidiaries. DE 1 at 5-6. The Renew addiction treatment clinics were, at various times, in Ivel, Prestonsburg, Harlan, Pikeville, and Whitesburg, Kentucky. *See* DE 114 at 71-73 (trial testimony of Megan Johnson); *id.* at 268 (testimony of Dr. Carmen Parker). Sisco also jointly owned ASAP Addiction Treatment Clinic with Alexandria Allen, his sister. *Id.* at 12 (trial testimony of Alexandria Allen). The bulk of evidence at trial focused on the Renew family of companies and Toxperts (Sisco's lab) because these companies Sisco solely controlled. *Id.* at 13. BHP and/or Renew, through its various locations, purported to provide MAT prescriptions (the Suboxone). The counseling provider was a trial issue; Sisco's papers claimed that a distinct entity, Renew Behavioral Health ("Renew BH"), provided counseling services. Suffice it to say that the government contested (nay, shredded) that characterization. Toxperts, a captive lab, performed all the urine drug testing for the Sisco companies. The wire fraud scheme involved lies to facilitate fraudulent and illegal cash billing of patients for Medicaid covered services provided by the Sisco clinics.

Sisco enrolled ASAP, BHP, and Toxperts as Medicaid providers in the first half of 2015. *See* Gov. Ex. 1A-1H; DE 115 at 182-83. That same year, the Kentucky Medicaid program first began covering MAT and required that any Medicaid credentialled provider administering this service to a Medicaid member bill **only** Medicaid, and not the member, for a covered service. *See* DE 49-1. Before and after this change, Sisco charged his clinic patients cash for services. *See, e.g.*, DE 113 at 77-78 (testimony of Tanya Bentley); *id.* at 92 (testimony of K.G.). Sisco continued to do so after the Medicaid change, despite being well aware of the new rule. DE 114 at 271-75 (testimony of Dr. Parker). From May 10, 2016 through October 30, 2019, Sisco charged clinic Medicaid patients between $200-$300 per month for certain services, despite BHP/Renew and ASAP being credentialled by Medicaid to provide MAT services. *See* DE 1 at 7. Sisco's explanations for these

payments, both to his employees and to clinic patients, varied widely over the relevant period. Some patients testified they were told the cash charge covered the doctor's visit, while others understood it to cover counseling or a facility fee. *See, e.g.*, DE 113 at 93 (testimony of K.G.); DE 116 at 141 (testimony of C.M.). Employees or clinic doctors believed, based on communications from Sisco or the office manager (who relayed information from Sisco) that the fee covered counseling and UDT (DE 113 at 49 (testimony of Dr. Ford)), the doctor's visit and counseling (*id.* at 79-80 (testimony of Tanya Bentley)), case coordination (DE 114 at 245 (testimony of D. Burchett)), and counseling (DE 116 at 37-38 (Dr. Maynard)). Some (*e.g.*, Dr. Ford, *see* DE 113 at 50-51) also thought the payment was temporary as Sisco's clinics worked out kinks or delays in the credentialling process. Importantly, every employee and every doctor said that Sisco alone set payment protocols and dictated the cash payment approach.

Sisco tried to document (or perhaps misdirect) a self-protective theory through the use of patient enrollment forms. Each patient at a Sisco clinic signed a "Statement of Financial Responsibility." *See* DE 115 at 141-42 (testimony of Tammy Mullins). These statements were crafted solely by Sisco and morphed suspiciously over the years, providing varying explanations for the cash payments. *See, e.g.*, Gov. Ex. 8H (form indicating cash charge is for counseling services provided by Renew Behavioral Health); Gov. Ex. 8G (form indicating cash charge is for care coordination and a facility fee); Gov. Ex. 8E (counseling and care coordination). Sisco asserted, and argued at trial, that these payments were for counseling provided by the entity Renew BH, which, from 2015 onward, was not Medicaid credentialled. Sisco, through BHP/Renew and ASAP, billed Medicaid for services during this same period, with evidence showing that Sisco billed Medicaid for some amount of counseling at the clinics as well. *See* Gov. Ex. 7A1, 7A7; DE 115 at 220, 226 (testimony of Jason Vertrees establishing that the Sisco clinics billed $353,465.38 to Medicaid for counseling from the third quarter of 2017 through February 2020).

4

The cash payments from clinic patients totaled over $5 million in the course of three years. *See* Gov. Ex. 11A2; DE 116 at 86 (testimony of Jennifer Ratterman). The fraud targeted two types of victims. First, a Medicaid provider could not (in compliance with Medicaid rules) charge a recipient cash for a Medicaid-covered service. As patients complained about the cash payments, Sisco's clinics provided a series of inconsistent and false explanations. Millions of dollars in cash flowed into the clinics via the cash requirement. Second, Sisco kept billing Medicaid for MAT services. He, if honest with Medicaid, would not have been allowed to do that because his structure and approach violated the preemptive Medicaid rules. Sisco kept charging the cash, under false pretenses, and he kept billing Medicaid. Some of that billing was for counseling, but all of it was inconsistent with the Medicaid exclusive payment protocols.

Sisco well knew the rules,[1] as his interactions with biller Tammy Wright and with Dr. Ford showed. Wright repeatedly told Sisco he could not charge cash to Medicaid patients and said she would have quit if she had known he was charging cash for counseling. DE 114 at 166-68 (testimony of Tammy Wright). To Dr. Ford, Sisco blew off a threatening Medicaid letter as a "scare tactic." He claimed he had the situation in hand.

The health care fraud scheme centered on the urine drug testing performed at Sisco's clinics and by Toxperts, which Sisco owned and exclusively controlled. The record explained the types of and reasons for UDT as part of the MAT program; testing confirms therapeutic use of Suboxone and a patient's compliance with rules against illicit drugs. Each time a patient came to a Sisco clinic, the clinic tested the patient via a point of care cup. DE 114 at 278-79 (Dr. Parker). Testimony at trial established that these cups provide an instant, preliminary screening for drug presence in the urine. *Id.* Then, the clinic sent every urine sample to Toxperts for further testing. *Id.* At Toxperts, the

---

[1] The language of 907 KAR 3:005, which precludes a cash charge to a Medicaid patient for a covered service, admits of little debate.

samples received a second screening test, through instrumentation, and a more detailed quantitative, or confirmation, test. *Id.* at 56-57 (testimony of Sanjay Srivastava). Both tests were performed on every sample at Toxperts and were then billed to Medicare or Medicaid. *See id.; see also* Gov. Ex. 7A1-7A5 (summarizing full encounter and billing history). Where was the fraud? Well, the government showed that Sisco (a non-physician) individually set and controlled all testing protocols. Although Toxperts billed for millions in testing, there were no physician orders for such tests, and the lab screening was directly duplicative of the on-site, point-of-care screening. Medicare has clear rules about medical necessity, and Medicare bars blanket-order testing protocols of this type. Similarly, Medicaid requires that testing be individualized and reflected in a written physician order. The fraud theory is that Sisco knew well the regulatory parameters and yet submitted thousands of tests knowing they were medically unnecessary, flawed, and not payable, thus receiving unwarranted payment from Medicare and Medicaid based on his false submissions.

*Claims related to the wire fraud charge*

Turning first to Sisco's arguments related to the wire fraud conduct on cash payments, the Statements of Financial Responsibility, and proof of fraud or deceit—grounds one, three, five, and six above—the Court disagrees and finds in the record plenteous evidence to support the jury verdict on the wire fraud count.

Wire fraud requires proof that (1) the defendant devised or intended to devise a scheme to defraud in order to deprive another of money or property; (2) that the scheme included a material misrepresentation or concealment of a material fact; (3) that the defendant had the intent to defraud; and (4) that the defendant used or caused another to use wire, radio, internet, or television communications in interstate commerce in furtherance of the scheme. *See* 18 U.S.C. § 1343. Sisco, until October 2019, required every clinic patient to pay cash for services, regardless of their Medicaid status. Sisco, through the Statements of Financial Responsibility he created, claimed these payments

6

were for various things, from counseling, to a facility fee, to a care coordination charge. Doctors at the clinic, clinic patients, and employees each had a different understanding of the purpose of the cash charge, informed by lies from Sisco or passed along from Sisco through manager Tammy Mullins. *See* DE 114 at 84-85 (testimony of Megan Johnson) (understanding the cash to be for care coordination and facility charge, and later a case coordination charge); DE 114 at 223-24 (testimony of T.E.) (understanding the cash to be for counseling and the doctor visit); DE 115 at 79-80 (testimony of Jeffrey Hensley) (understanding the cash payment to be for counseling, office visit, and physician fee); DE 115 at 132-33, 95 (testimony of Tammy Mullins) (understanding the cash payments to be for care coordination and a facility fee; her understanding of the cash charge came directly from Sisco); DE 113 at 49 (testimony of Dr. Ford) (understanding the cash charge to be for UDT and counseling). The explanation for these charges shifted to justify and facilitate Sisco's scheme of fraudulent cash charges, while Sisco kept sole discretion over who would pay and the characterization of the payment. *See* DE 115 at 114 (testimony of Tammy Mullins). The testimony at trial clearly shows an effort on Sisco's part to justify the cash payments, however possible, by misrepresenting or dissembling over their purpose and basis.

Regardless of the explanation, the cash charges, at least those following the 2015 regulation change, were impermissible. Medicaid prohibits an enrolled provider from charging a patient cash for any covered service, even if the provider does not simultaneously bill Medicaid for that service. For example, Renew and ASAP billed Medicaid for MAT and then charged patients cash purportedly for counseling—this is against Medicaid rules, and Sisco knew that. If a provider chooses to enroll with Medicaid, the provider cannot bill a member for any Medicaid-covered service. *See* 907 KAR 3:005. The provider must either bill Medicaid, or not bill at all. *See* DE 115 at 262-264 (testimony of Lee Guice). Of course, any provider may simply choose not to enroll in Medicaid, and thus bill cash for everything—Sisco's scheme tried to have it both ways to fatten his wallet. *See id.* Sisco charged

7

cash for MAT services and billed Medicaid during the same period. These bills were submitted electronically, over the Internet, establishing the interstate commerce jurisdictional hook. *See* DE 114 at 160-62 (Tammy Wright); *see also United States v. Pina*, 742 F. App'x 413, 422-23 (6th Cir. 2018) (recognizing that it is the law of this circuit that the internet is an instrumentality of interstate commerce). Sisco was fully aware of the illegality of his actions. Tammy Wright, an employee of Sisco, alerted him to the impropriety of billing cash for any Medicaid service. *See* DE 114 at 166-67 (testimony of Tammy Wright). Dr. Parker, a doctor at Renew, discussed with Sisco a warning letter from Medicaid regarding the prohibition on cash charges, and he falsely brushed it off as a "scare tactic." *See id.* at 275-76.

The Court also notes some issues and confirmatory oddities in the shape-shifting Statement of Financial Responsibility forms. As already noted, the payment characterization was a moving target. There were times the payment was a "Renew Behavioral Health" charge, *e.g.*, for counseling. There were times the payment was a Behavioral Health Professionals (*i.e.*, clinic) charge, *e.g.*, "that Behavioral Health Professionals has a Care Coordination Fee and Facility Charge of $200.00." Gov. Ex. 8G. It is difficult to trace the explanation and find any consistency. However, it is crystal clear that the entities were all functionally and financially interlocked. Every statement reflects that BHP would give counseling credit only for Renew-based counseling. The failure to pay the cash fee would result in "termination from the program in its entirety." *See id.* Thus, while patients could choose to go elsewhere, they could not choose to get medical treatment at BHP and then counseling at another location. This fused the providers together, made the cash mandatory, and was strongly indicative of Sisco's improper overall scheme. Finally, Sisco stopped the cash charge when the clinics, in October 2019, began billing Medicaid for counseling; this on/off toggle plainly shows that the cash was a stealth cash-for-counseling stratagem throughout.

8

Sisco attempted to cover his fraudulent actions by representing that Renew BH provided the counseling and was a separate provider from BHP—the jury quite rightly viewed this construct as a fabrication. Testimony of Dakota Maynard, a counselor at Renew, established that there was no Renew BH letterhead, that Mr. Maynard was never an employee of Renew BH, that his checks did not come from Renew BH, and that no sign, form, paper, medical record, or anything else—beyond the Statements of Financial Responsibility crafted by Sisco—at the Renew clinics ever indicated the existence of a separate counseling company. DE 114 at 191, 194-96, 201-02; *see also* DE 115 at 78-79 (testimony of Jeff Hensley, another Renew counselor, indicating he did not work for Renew BH and had never heard of it). Testimony of FBI Accountant Jennifer Ratterman established that Renew BH had no bank account and paid no wages or operating costs. *See* Gov. Ex. 11A-1 (list of bank accounts controlled by Sisco). Ms. Ratterman testified that she reviewed the cash collection receipts recovered from the Renew clinics, compared them to cash deposits into two accounts controlled by Sisco and held in the name of ADAPT and ASAP, and found near identical matches between the amount of money collected at the Sisco clinics and money deposited into Sisco's accounts. *See* DE 116 at 82, 90; Gov. Ex. 11A-4, 11A-2 (showing cash deposits into accounts held by ADAPT and ASAP). Thus, any money purportedly collected for "counseling" was deposited into a general account for Sisco's parent company, ADAPT—it was not separated to an account for an independent counseling company. This is because the counseling company, Renew BH, existed only on paper to support Sisco's scheme of charging cash and billing Medicaid at the same time. Tammy Mullins confirmed that the counsellors worked for Sisco, not for a separate company. The case proof, through Agent Copley, included records showing that Renew BH had no presence as an employer in the Kentucky unemployment regulatory system. *See* DE 116 at 205-07 (Copley). The head trainer for the counsellors had never heard of Renew BH. *See id.* at 67 (testimony of Vicky Bonyata). Truly, it was a phantom.

Sisco, it is fair to infer, purposefully terminated the Medicaid enrollment for Renew BH so he could game the rules and continue to pursue cash payments—a much more lucrative comparative option. *See* Gov. Ex. 1B, 1D, 23; *see also* Gov. Ex. 7A-8 (showing that average Medicaid reimbursement for counseling was $18-40). The glaring profit motive substantially informs the analysis. Sisco's clinics generated over $5 million in cash, funneled from the clinic patients' pockets ultimately into his own. DE 116 at 86-87 (Ratterman).

Sisco's third argument under Rule 29, that he never "double-billed" for a particular service, is largely irrelevant. It does not matter whether he billed cash for counseling and also billed Medicaid for the same counseling. It was illegal and impermissible, under program rules, to charge cash for *any* Medicaid covered service while billing Medicaid for *any other* covered service. The fraud hinged on Sisco's lies, falsehoods, and omissions that hid, furthered, or advanced his ability to continue the forbidden practice and keep the cash machine running. Even so, there was evidence that the clinics billed Medicaid a significant chunk, during the relevant time, for counseling. *See* DE 115 at 220-21 (Vertrees); *see also* Gov. Ex. 7A7. Logically, and per the record, this argument fails.[2]

### Good faith and mistake of law defense

As to Sisco's claim that the evidence was insufficient to overcome a defense of good faith and/or mistake of law, the Court is unconvinced. Sisco rests this claim solely on evidence presented regarding his communications with Stuart Owen, a former employee of the Kentucky Cabinet for Health and Family Services, which administers Medicaid. "The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." *United States v. Trevion*, 7 F.4th 414, 424 (6th Cir. 2021). The Sixth Circuit recognizes one

---

[2] Sisco's stray Rule 404(b) argument is undeveloped. The Court dealt with a motion on the topic pretrial. DE 72 (Motion); DE 77 (Order). The briefing here is non-specific. The post-October 2019 proof (a) directly related to Count 2 and (b) directly reflected on Sisco's motives emerging from the Count 1 conduct.

limited exception for "highly technical statutes, such as tax or banking statutes." *Id.* at 424 (internal quotations and citations omitted). Neither Sisco's Rule 29 motion nor his Rule 33 motion elaborates on this point. The conviction here is for wire fraud, and Sisco points to no law supporting a mistake of law defense under § 1343. *See, e.g.*, *United States v. Blagojevich*, 794 F.3d 729, 739 (7th Cir. 2015) (affirming that mistake of law is no defense to wire fraud); *see also United States v. Paradies*, 98 F.3d 1266, 1285 (11th Cir. 1996) ("In mail fraud cases, the government need only prove that the defendant had the intent to deceive, and ignorance of the law is no defense."). Whatever the regulatory complexity of Medicaid, Sisco had a demonstrable familiarity with navigating the rules; he structured his approach specifically to foment the cash scheme, which he then implemented and protected, with lies, over a 3+ year period. Sisco did not request the mistake instruction at trial. This argument fails.

Sisco, to support his good faith assertion, presented an email exchange between himself and Stuart Owen. Specifically, Sisco posed a structural hypothetical to Owen regarding cash charges for counseling from a "separate company" where clients have the "right to choose" such separate provider. *See* Def. Ex. 1. Owen, who knew nothing of Sisco's business structure and had no specifics, gave a generic answer premised on some assumptions, including patient choice and actual company separateness. *See id.* Owen also stated that the regulations prohibit a Medicaid provider from charging a member for a Medicaid-covered service. *Id.* Owen testified at trial that the only time a Medicaid provider may bill a member for a service is if the service is not covered by Medicaid. DE 117 at 160-61. He testified that, at the time he responded to Sisco's inquiry, he had no knowledge whatsoever of Sisco's businesses or their organization. *Id.*

The Court did include a good-faith instruction. *See* DE 89 at 25, Instruction # 20. The jury properly rejected Sisco's claimed good faith. Owen's general email, premised on Sisco's general (and inaccurate) query, hardly blessed what Sisco did. Owen, of course, did not endorse lies and material omissions to patients, employees, doctors, and Medicaid. He did not validate use of a sham entity to

create the illusion of separateness. He did not okay a process where patients could not choose distinct counseling outside the Sisco family and could only receive medical treatment if they ponied up cash on site for Sisco's counseling services. Needless to say, the thin hint of good faith washed off under the wave of proof regarding Sisco's fraudulent intent. *See also* Gov. Ex. 2A (2016 warning letter to Dr. Parker, which she discussed with Sisco).

*Claims related to health care fraud conviction*

Turning lastly to Sisco's challenges to the evidence of health care fraud, the Court again finds ample evidence supporting a rational jury's guilty verdict. To prove health care fraud, the government must show (1) that the defendant knowingly and willfully executed a scheme to defraud any health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) that the scheme related to a material fact or included a material misrepresentation or concealment of material fact; and (3) that the defendant had the intent to defraud. Evidence at trial established that Sisco created the UDT protocol at all of the clinics and at Toxperts. The protocol maximized Medicare and Medicaid billing without the foundation of medical necessity. Sisco clearly knew this and intentionally billed for services that were improper, ill-founded, and fraudulent.

Medicare requires that all services, to be payable, be reasonable and necessary for the diagnosis and treatment of illness or injury. *See* 42 U.S.C. § 1395y(a)(1)(A). Tests not ordered by a physician are not reasonable and necessary. *See* 42 C.F.R. § 410.32(a). Dr. Earl Berman, a physician for the Medicare contractor that administers Medicare for Kentucky and Ohio, testified at trial that for any service or treatment to be properly reimbursable, it must be medically necessary. *See* DE 115 at 11, 13. Dr. Berman further testified that every Medicare service should be patient specific, individualized, and well-documented. *Id.* at 15-16. Dr. Berman then established that a Local Coverage Determination ("LCD"), which supplies payment rules, bars reimbursement for UDT done pursuant to a blanket order—that is, a testing order applied indiscriminately to all patients. *See* Gov. Ex. 22

Local Coverage Determination, L36029. Thus, from Medicare's perspective, medically necessary and reimbursable UDT procedures must be ordered by a physician based on the specific needs of each patient. Berman further established that all Medicare reimbursement requests are processed electronically, through the internet. DE 115 at 17.[3]

Sisco's approach flouted these standards. Under Sisco's designed protocols, every patient provided a urine sample at every visit, using a point of care cup that provided an instant screening result. DE 113 at 43-44 (Dr. Ford); DE 116 at 10-11 (Dr. Maynard). Every sample was then sent to Toxperts for a *second* screening test and a confirmatory test. DE 114 at 58-60 (Srivastava). Both the screening and confirmation tests at Toxperts were then billed to Medicare. *See* Gov. Ex. 7A1, 7A3 (testing/billing analyses). Incredibly, over the entire charged period, no physician ordered **any** of the testing. Every testifying doctor denied ordering tests. DE 116 at 12 (Dr. Maynard); DE 113 at 45 (Dr. Ford); DE 114 at 283-84 (Dr. Parker). Most doctors were not even aware that the second (and duplicative) screening test was being performed, and Dr. Maynard thought such a double test would be redundant and unnecessary. DE 116 at 15 (Dr. Maynard); DE 114 at 283 (Dr. Parker). None of the testifying doctors had ever even seen the lab requisition forms used to order the tests at Toxperts. *See, e.g.*, DE 116 at 16-17, 19-21 (Dr. Maynard). Likewise, on the lab side, the employees never saw a physician order. *See* DE 114 at 60 (Srivastava). The government's search warrants produced no orders, per the case agent. DE 116 at 202-03 (testimony of Randy Copley).

Every witness also attributed the testing decisions, protocols, and billing to Sisco. This came from the physician side (*see e.g.*, DE 114 at 304 (Dr. Parker) (describing Sisco's standing order and Dr. Maynard attributing protocol to Sisco)), the lab side (*see e.g.*, DE 114 at 60 (Srivastava)), and the

---

[3] The Medicaid proof was similar. Kentucky requires a written physician order to support billing by a lab. 907 KAR 1:028 § 2(1)(c). Medicaid also requires individualized treatment. *See* DE 116 at 160-61 (testimony of Ann Hollen, Dept. of Medicaid Services employee).

staff side (*see e.g.*, DE 115 at 156-57 (testimony of Tammy Mullins) (pegging the testing pivot in late 2019 to Sisco)). Requiring the secondary (lab) screen and then a confirmation on every positive[4] yielded substantial fiscal results. Toxperts, Sisco's captive lab, collected over $4 million for UDT from 2016 through 2020. *See* DE 115 at 198-99 (Vertrees); Gov. Ex. 7A1.

It is true that the doctors all wanted or expected some level of testing as part of the overall MAT framework. No one, the prosecution included, suggested that all testing was automatically suspect or improper. The problem is that Sisco, per the proof, took a situationally valid MAT component and built a fraudulent overbilling scheme around it. He knew the requisites of proper billing and promised his bills would comply with Medicare. He knew physician orders, premised on medical necessity, must undergird lab testing. Yet, as a non-physician, it was Sisco that authored and implemented a system to blanket test—each patient, each sample—in a manner that focused on fee generation, not medical necessity. When Sisco did this, to the tune of $4 million far from the tether of documented, doctor ordered, individual treatment, he committed health care fraud.

Events at the October 2019 practice pivot starkly illustrate Sisco's intent. At that point, he ceased the cash charges at his clinics (the subject of Count 1). He also then unilaterally implemented a change, an acceleration, to the patient appointment protocols. Thus, starting in October 2019, Sisco required all clinic patients to participate in **weekly** counseling and UDT—a dramatic change from the typical schedules of twice monthly or monthly visits. DE 115 at 81 (Jeff Hensley); *id.* at 117-18 (Tammy Mullins). No doctor ordered this weekly testing, and two doctors testified that it was not necessary for compliant patients. *See* DE 114 at 308 (Dr. Parker); DE 116 at 29-34 (Dr. Maynard).[5]

---

[4] Logically, every test for a Suboxone-clinic patient would yield a positive.

[5] The highly compliant B.B. was an exemplar for this absurdity. Despite lengthy stability as a patient, with a regular schedule of monthly monitoring and treatment, the clinic required that she begin weekly sessions in October of 2019. DE 115 at 245 (testimony of B.B.) ("But then they started my treatment over and started making me go weekly[.]"). Not only did the doctors not validate the change, they, at trial, balked at any need as to stable patients.

The change (and given the UDT protocols) sharply increased UDT billing. *See* Gov. Ex. 7A5 (noting testing encounters spiked from 340 to 895 month over month). As typified the entire period, Sisco, a lay person with no medical training, drove the UDT protocols, including the particular, revenue-spiking change in October, 2019, a change that suspiciously dovetailed with the loss of the cash-for-counseling income stream. Dr. Parker attributed the change to "Mr. Sisco." DE 114 at 308. Her telling characterization of the reason for the change: "My understanding, it was for billing." *See id*.

The jury verdict quite reasonably reflected the proof—Sisco orchestrated billing unmoored from medical necessity and physician control. He knew this, knew the claims were not compliant or payable, and yet implemented a system that submitted thousands of unfounded bills to Medicare and Medicaid, producing a river of lucre. The jury properly called this fraud.

For these reasons, the Court **DENIES** DE 100. The convictions stand.

### III.    Rule 33 Motion

#### a.    Legal Standard

A court's role in deciding a Rule 33 motion is more expansive than the Rule 29 acquittal review. Thus, a district court analyzing a new trial motion may "sit as a thirteenth juror" to assess credibility and weigh facts. *United States v. Munoz*, 605 F.3d 359, 373 n.9 (6th Cir. 2010). Nonetheless, a defendant arguing the verdict "was against the manifest weight of the evidence" must clear a high bar. *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (Rule 33 motions are granted only in the "extraordinary circumstance where the evidence preponderates heavily against the verdict."). Courts have also interpreted Rule 33's broad "interest of justice" language to warrant new trials in a host of other circumstances. *See United States v. Griffin*, No. 15-CR-1-ART, 2015 WL 13358334, at *1 (E.D. Ky. Apr. 29, 2015) (collecting cases). Ultimately, however, a new trial is a disfavored remedy, to be granted "with great caution." *United States v. Fritts*, 557 F. App'x 476, 479

(6th Cir. 2014) (citation omitted). The Court, in its discretion, rejects the Rule 33 arguments Sisco advances.

### b. Discussion

In his Rule 33 motion for a new trial, Sisco raises the same sufficiency grounds for relief as in his motion for acquittal, but with additional claims related to the jury instructions and forfeiture process. *See* DE 99. Sisco challenges the language of Jury Instruction #18 and complains that the Court did not include an instruction on the defense of entrapment by estoppel. *Id.* at 4, 6. Finally, Sisco argues that the Court deprived him of the opportunity to have a jury determine forfeiture liability. *Id.* at 8.

The Court first references, rather than restating, the factual background established in the discussion on the Rule 29 motion. The Court, applying the less jury-deferential Rule 33 standard, finds that there was ample evidence at trial to support the verdict as to the wire fraud and health care fraud counts. The Government abundantly proved both charges, and the verdict was just.

Without restating the entire wire fraud analysis, the Court specifically points to critical pieces of evidence at trial:

- testimony of several employees, doctors, and patients about their varying understandings of the purpose of the cash charges, and that these understandings came either from Sisco personally or through Tammy Mullins (who pertinently acted at Sisco's direction);

- the Statements of Financial Responsibility used by the clinics and crafted solely by Sisco, which (with no rhyme or reason) changed over time to reflect that cash charges were for counseling, a facility fee, or care coordination;

- the same statements essentially locked patients into the cash for counseling arrangement by denying patients unaffiliated counseling credit and requiring the cash upon pain of exclusion from the clinic programs;

- the warnings Sisco received both from Medicare and his own employees about the impropriety of his cash billing practice, his refusal to change, and his disingenuous characterization of such warnings as "scare tactics";

- the lack of any credible evidence that Renew Behavioral Health was a separate provider, including testimony showing no counselor knew of Renew BH or considered himself a Renew BH employee, that all counselors were paid from the ADAPT general fund, that all cash collected purportedly for counseling was deposited into the ADAPT and ASAP general accounts, that Renew BH had no bank account or employer footprint in the Kentucky system, that no clinic documentation (except Sisco's Statements of Financial Responsibility) carried the Renew BH name;

- testimony (from Megan Johnson, DE 114 at 82) that 75% of the clinic patient population had Medicaid; and

- the staggering profit motive, based on the clinics' generated $5 million in cash payments during the period, nearly $4 million related to Medicaid reimbursements.

This evidence strongly supports the verdict; the Court rejects any sufficiency theory under Rule 33.

The Court also finds plentiful evidence to support the jury's verdict on the health care fraud charge. Again, the Court points to critical record components:

- testimony that medical necessity—as a matter of regulatory and billing propriety— requires patient individualization, physician decision, and an express order;

- testimony that no doctor ever ordered the drug tests or even knew that a large bloc of the testing (especially the redundant lab screening) was occurring;

- testimony that every sample collected received the identical testing protocol, to include redundant screening and invariable confirmation;

- the expectations on provider compliance with the billing systems of Medicare and Medicaid are extremely clear, and each credentialled provider promises its compliance;

- testimony that all drug testing protocol design and decisions were made solely by Sisco, who is not a doctor and has no medical training;

- the sudden switch, at Sisco's direction, from bi-monthly or monthly testing for each patient to weekly counseling and testing, no matter the compliance of each patient, which, in a sketchy dovetail, coincided with the clinics' cessation of cash charges; and

- the enormous profit motive—Sisco's captive lab, Toxperts, billed Medicare and Medicaid close to $5 million for UDT during the Count 2 period.

This evidence supporting the fraud scheme on Count 2 is stout and compelling. The Court rejects Rule 33 relief on this Count.

*Challenges to jury instructions*

Turning next to Sisco's challenges to the jury instructions, the Court first notes that Sisco did not raise these particular arguments at trial, despite having ample opportunity to do so. First, the parties submitted proposed jury instructions, and Sisco did not request a mistake of law or entrapment by estoppel instruction. DE 70. Next, the parties had three opportunities to object to the jury instructions and request new or different instructions. *See* DE 92 (showing changes in jury

instructions over time with party input). Sisco did not request a mistake of law instruction.[6] The Court included the substance of Sisco's requested good faith instruction, which fairly protected Sisco to the extent he acted on an honest belief, opinion, or basis relative to the acts at issue. *See* DE 89 at 25, Instruction #20. Sisco also failed to request an entrapment by estoppel instruction. It is not in his tendered instructions, and Sisco made no request for the instruction during the trial, at, or after the charge conference.

Where a defendant fails to request an instruction at trial and later complains about its omission, the Sixth Circuit reviews for plain error. *United States v. Eaton*, 784 F.3d 298, 306-07 (6th Cir. 2015). "This standard poses the inquiry of whether the instructions, given as a whole, were so clearly wrong as to produce a grave miscarriage of justice." *Id.* at 307. The Court, with no request from Sisco, would not have sua sponte given an entrapment by estoppel instruction, which was almost certainly unavailable to Sisco. *See also* FED. R. CRIM. P. 30(d) (indicating jury instruction objection mechanics, including plain error standard as applicable).

In order to prove the defense of entrapment by estoppel, a defendant must show that: (1) a government agent announced that the charged conduct was legal; (2) the defendant relied on the agent's announcement; (3) the defendant's reliance was reasonable; and (4) given the defendant's reliance, prosecution would be unfair. *United States v. Levin*, 973 F.2d 463, 468 (6th Cir.1992). Only an agent of the federal government can make a statement giving rise to this defense in a federal prosecution. The entrapment by estoppel defense will not shield a defendant from federal prosecution

---

[6] And Sisco does not substantiate such an instruction. The Court carefully instructed on the intent element of the fraud counts. Courts have rejected mistake of law as a wire fraud defense. *See United States v. Blagojevich*, 794 F.3d 729, 739 (7th Cir. 2015) (affirming that mistake of law is no defense to wire fraud). Sisco has the burden under Rule 33, and he shows no cognizable error here. Section 1347(b) expressly eliminates any requirement that the government prove actual knowledge of § 1347 or specific intent to violate that statute.

when the representations of legality came from state officers. *United States v. Hurst*, 951 F.2d 1490, 1499 (6th Cir. 1991); *see also United States v. Ormsby*, 252 F.3d 844, 846 (6th Cir. 2001); *United States v. Lemons*, 480 F. App'x 400, 403–04 (6th Cir. 2012) ("[T]his court has held that the estoppel by entrapment defense is unavailable when a state or local law enforcement official makes a representation, and the defendant is subsequently prosecuted by the federal government."). Here, Stuart Owen (the alleged authorizing speaker) was a state employee. DE 117 at 136. Trial testimony further established that Medicaid is a state-run program, funded in part by the federal government. *See* DE 115 at 7 (Dr. Berman). Thus, the applicability of this defense is, at best, doubtful. Even if Owen was a qualifying speaker, the scenario put to him by Sisco was inaccurate and incomplete. No rational factfinder could view how Sisco ran the clinics (including a sham entity in the counseling role, umbrella billing, no true patient choice, and the ever evolving and deceptive justifications for cash charges) as built on Owen's non-specific answer. This signals that the defense, which protects against an unfair prosecution of reasonably reliant behavior, would not apply. Again, Owen, of course, nowhere validates the misrepresentation, lies, and omissions Sisco repeatedly generated to explain the cash charges to Medicaid recipients; these, along with deception toward Medicaid, were the things that produced federal liability. The Court finds no error or injustice in the omission of this unsought instruction.

Sisco also challenges the language of Jury Instruction #18, specifically that it forced "the jury to assume that in order for drug testing to be considered 'reasonable and medically necessary' that Medicare and/or Medicaid must deem it so, and fails to consider that a physician may deem a urine test reasonable and medically necessary without seeking reimbursement from Medicare and/or Medicaid." DE 99 at 4-5. The instruction merely captures the standards pertaining to one aspect of the case; it is based on the underlying statutory and regulatory law, and established program guidance, discussed during the trial. Again, Sisco did not raise *this* challenge at any point during trial. Sisco

20

raised a single challenge to this instruction—that the words "in writing or electronic request" be taken out. *See* DE 92 at 60. The Court kept the verbiage because the Kentucky regulation expressly includes it, and the Instruction made clear that the Court was describing that source. *See* 907 KAR 1:028 § 2. Immediately following this instruction, the Court instructed the jury that a violation of any of the program statutes, regulations, or LCD's, absent criminal intent, was not a crime and that the defendant was not charged with regulatory violations. *See* DE 89 at 24, Instruction # 19. Sisco's specific argument, that a physician could order a test without seeking reimbursement, is simply irrelevant. The Instruction accurately stated the law and fit within a framework designed to instruct the jury fully and fairly.

*Forfeiture challenge*

Finally, Sisco complains that the Court failed to retain the jury to determine the question of forfeiture. *See* DE 99 at 8. The Court fully dealt with this topic in its Preliminary Forfeiture Order, DE 111, at 6. The Court confirmed, at the pretrial, that the United States sought only a money judgment. The Court confirmed, at the pretrial, that no party sought jury involvement in that topic, if it ripened. Sisco confirmed this by inaction—at no point (in tendered pretrial instructions, during the trial, or at or after the charge conference) did Sisco tender a forfeiture instruction or request jury involvement. As additionally noted in DE 111, Sisco would not have had the jury right, as to a money judgment, anyway. The argument has no Rule 33 traction.

**IV.   Conclusion[7]**

---

[7] Some arguments elude analysis. The Court did not instruct the jury that a failure so secure Medicaid credentials equals criminal conduct. The government did not make that argument. Credentialling status, including changes, was evidence of intent in the case, but there was no suggested equivalency between such status and criminality.

The Court **DENIES** DE 99 and DE 100.[8]   The jury spoke, its verdict is well-supported, and Sisco earns no post-trial relief from his motions.

This the 4th day of March, 2022.

Signed By:

*Robert E. Wier*   *REW*

**United States District Judge**

---

[8] In reply, Sisco tries to inject jurisdiction. A reply is not the place for new arguments, so the Court rejects the sortie. *See, e.g.*, *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration."). However, the record well-supported jurisdiction. Sisco's biller confirmed that all Medicaid billing was on-line, via the internet. The internet is an instrumentality of interstate commerce. *Pina*, 724 F. App'x at 423 (noting "the use of the internet [is] inextricably linked to interstate commerce"); *United States v. Person*, 714 F. App'x 547, 551 (6th Cir. 2017) ("The government proved the commerce element in this case by showing that Person's crimes involved the internet, which is a channel of interstate commerce."). The parties here stipulated, DE 73, that claims the providers submitted in the case to Medicaid "were submitted electronically using interstate wire communications." Dr. Berman confirmed that all Medicare billing likewise is electronic, through the internet. Further, Medicare and Medicaid surely qualify under 18 U.S.C. § 24(b), as many courts have determined. *United States v. Frost*, 355 F. App'x 230, 234 (10th Cir. 2009) ("Several courts have held that the Medicare and Medicaid programs are both health care benefit programs as defined in 18 U.S.C. § 24(b)."). With nearly $5 million in billing at issue under Count 2, much of it federal money, the jury's determination on the "health care benefit program" element is impervious to a challenge on sufficiency.